# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br>**ROBERT NARVETT,**<br><br>Defendant. | Civil Action No. 1:21-cv-00291<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT** |

Plaintiff Commodity Futures Trading Commission ("Commission") alleges as follows:

## I. SUMMARY

1. From at least December 2013 through the present (the "Relevant Period"), Robert Narvett ("Narvett") engaged in a fraudulent scheme through which he induced clients to allow him to manage commodity futures trading accounts on their behalf and then abandoned his clients after losing money trading their accounts and misappropriating their investment funds.

2. Narvett solicited clients for his fraudulent scheme by making numerous false and misleading material statements concerning, among other things, his alleged trading successes and methods. In particular, he falsely represented to existing and prospective clients that they would earn a return on investment of around ten to twenty percent per year, and that the strategies he employed were a safe way to invest money. In soliciting funds from existing and prospective clients, Narvett also omitted material facts such as (1) he consistently lost money trading commodity futures contracts; (2) he was not registered with the Commission as required by federal law; and (3) the Securities and Exchange Commission ("SEC") previously charged him

with operating a fraudulent investment scheme related to the offer and sale of promissory notes to family, friends, and others.

3. Through the scheme at issue here, from at least 2017 through the present, Narvett fraudulently solicited at least $196,799.91 from at least two clients, lost at least $14,294.06 of their money trading commodity futures contracts, and knowingly misappropriated at least $171,297.85 of their investment for his own benefit or for the benefit of the fraud. Upon information and belief, Narvett engaged in similar fraudulent conduct in connection with at least eleven other clients since early 2013.

4. By virtue of this conduct, and as more fully set forth below, Narvett has engaged, is engaging, and/or is about to engage in acts and practices in violation of Sections 4*o*(1) and 4b(a)(1) of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 6*o*(1), 6b(a)(1) (2018).

5. Additionally, Narvett acted at all relevant times as a Commodity Trading Advisor ("CTA") by soliciting clients to allow him to trade futures contracts on the clients' behalf, trading futures contracts on behalf of clients, and receiving financial compensation in return for trading futures contracts in client accounts, without being registered or exempt from registration with the Commission as a CTA, as required by the Act. Narvett's failure to register as a CTA violates Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018).

6. Unless restrained and enjoined by this Court, Narvett is likely to continue to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as described more fully below.

7. Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), the Commission brings this action to enjoin Narvett's unlawful acts and practices and to compel compliance with the Act. In addition, the Commission seeks civil monetary penalties and

remedial ancillary relief, including but not limited to trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II. JURISDICTION AND VENUE

8. This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (2018) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), provides that U.S. district courts have jurisdiction to hear actions brought by the Commission for injunctive relief or to enforce compliance with the Act in the proper district court of the United States whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

9. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2018), because Narvett is found in, inhabits, or transacts business in this District and the acts and practices alleged in this Complaint have occurred or are occurring within this District. Narvett solicited clients in and traded clients' futures trading accounts from Wisconsin, trading them on a futures exchange which is a Designated Contract Market ("DCM").

## III. THE PARTIES

10. Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and Commission Regulations ("Regulations") promulgated thereunder. The Commission maintains its principal office at 1155 21st Street N.W., Washington, DC 20581.

11.     **Robert Narvett** is an individual residing in Appleton, Wisconsin.  He has never been registered with the Commission in any capacity.

## IV.     FACTS

A.     **Narvett Fraudulently Solicited His Clients by Making Material Misrepresentations.**

12.     During the Relevant Period, Narvett held himself out as a CTA and solicited friends, family members, neighbors, and others to allow him to manage futures trading accounts on their behalf.  In his solicitations, Narvett knowingly made numerous deceptive, false, and misleading material statements.

13.     For example, in or around April 2017, with Narvett's assistance and at his direction, Clients A and B established a personal futures trading account at a futures commission merchant ("FCM") through the FCM's website.  Clients A and B were married and lived in Narvett's neighborhood, and they had very limited interactions and no preexisting relationship with Narvett prior to investing with him.  Clients A and B understood that Narvett ran his own investment business from his home.

14.     In March 2017, Narvett knocked on their door without any warning or invitation and proposed talking to Clients A and B about an investment opportunity.  Clients A and B eventually met with Narvett to discuss his proposal.

15.     In meetings held at their home or Narvett's home between March and April 2017, Narvett told Clients A and B that he was a different type of investor and did not deal in stocks and bonds but rather invested in "hedges and straddles."  He falsely told Clients A and B that his strategies were a safe way to invest money and that they would not lose any money.  He also falsely represented to Clients A and B that (a) they would make more money when the market was more volatile; (b) they would earn a return on investment of around ten to twenty percent

4

per year; and (c) he had successfully traded on behalf of other clients. Narvett knew these statements were false. Narvett further encouraged Clients A and B to invest as much money as they could.

16. At Narvett's urging, between March and April 2017, Clients A and B ultimately transferred a total of $196,799.91 to Narvett for him to invest on their behalf. They provided the vast majority of those funds to Narvett via checks and cash, including funds that they transferred from their individual retirement accounts and/or 401(k) accounts. Narvett told Clients A and B that they should use cash and check transfers because he wanted to avoid tax issues and did not want the money traced back to him.

**B.      Narvett Fraudulently Solicited His Clients by Omitting Material Facts.**

17. After opening their futures trading account at Narvett's direction, Clients A and B did not personally conduct any trading in it. Rather, at all relevant times, Narvett maintained full access to the account, and he traded futures contracts directly in the account. In an effort to conceal his scheme, Narvett failed to inform Clients A and B that a power of attorney or similar authorization was required to be filed with the FCM in order for Narvett to make discretionary trades on their behalf, even though he had to have known about this requirement. He also failed to inform Clients A and B that he was not registered with the Commission as a CTA as required by federal law. Upon information and belief, Narvett provided these purported advisory services to Clients A and B for compensation or profit.

18. Narvett was a former account holder of the FCM where he facilitated the opening of Clients A and B's account. The FCM terminated its relationship with Narvett in 2014 after he was charged by the SEC with fraud in connection with an alleged Ponzi scheme that he ran through Shield Management Group, Inc. ("Shield"), a private company that he owned and

5

controlled. *See* Complaint, *SEC v. Narvett*, No. 1:13-cv-00927-WCG (E.D. Wis. Aug. 16, 2013), ECF No. 1. Nevertheless, since his own accounts were terminated, Narvett has continued trading futures contracts for at least eleven additional clients in accounts held in the names of those clients at this same FCM, without disclosing his activities to the FCM.

19. In its action against Narvett, the SEC alleged that he raised at least $940,000 from at least twenty investors through the fraudulent offer and sale of promissory notes issued by Shield, and that, in exchange for their money, Narvett guaranteed that the investors would receive their principal investment plus a twenty percent return at the end of a specified term. The SEC further alleged that Narvett falsely represented to some of the investors that he would use the money as working capital to build Shield's business. According to the SEC's complaint, instead of using investor money for Shield's business, Narvett misappropriated most of the money raised from the promissory notes for his personal use. Specifically, the SEC alleged that Narvett used investor money to, among things, fund trading in his personal brokerage account; pay for various personal expenses, including mortgage payments, legal fees, and car payments; and make Ponzi-style payments of purported interest to other investors. To perpetuate that scheme, Narvett had advised clients to falsely represent to the SEC during the course of its investigation that the funds they provided to him were loans as opposed to investments.

20. Narvett and Shield did not contest the allegations of the SEC's complaint, and a judgment was entered against them obligating them to disgorge profits of more than $335,697.42 they received as a result of their fraudulent scheme, pay prejudgment interest on the disgorged profits in the amount of $18,886.50, and a pay a civil penalty in the amount of $300,000. *See* Judgment, *SEC v. Narvett*, No. 1:13-cv-00927-WCG (E.D. Wis. Oct. 17, 2014), ECF No. 31.

21. Narvett never disclosed the SEC's action or judgment against him to Clients A

and B, even though he knew about the action and judgment, nor did he inform them that the FCM where they opened their futures trading account had previously terminated its relationship with him as a result of the SEC's charges.

22. Clients A and B later learned about the SEC's action against Narvett from an employee at one of the financial institutions where they held accounts. In or around May 2017, Clients A and B confronted Narvett about the SEC's lawsuit in a meeting at his home. In an effort to dissuade Clients A and B from pursuing any kind of action against him, Narvett told them that in his past dealings, if investors reported him to the authorities they did not receive any money back from him. During this May 2017 meeting and/or in subsequent communications, in an effort to continue to perpetuate his fraud, Narvett also falsely promised Clients A and B that he would return a significant amount of their money to them. To date, however, he has returned only $11,208 to Clients A and B.

23. Had Clients A and B known about the SEC's investigation into Narvett's activities, they never would have invested money with him.

**C.    Narvett Acted as An Unregistered Commodity Trading Advisor.**

24. During the Relevant Period, Narvett acted in a capacity requiring registration as a CTA by (a) publicly soliciting clients, including Clients A and B, to trade futures contracts on their behalf; (b) trading futures contracts on behalf of clients, including Clients A and B; and (c) receiving financial compensation in return for trading futures contracts in client accounts.

25. Narvett solicited Clients A and B as well as other prospective clients primarily by approaching them in person. In addition to Clients A and B, in or around the Relevant Period, Narvett approached at least two other individuals with whom he had no preexisting relationship to solicit them to invest money with him.

26. Narvett then communicated directly with existing and prospective clients in person and via telephone and text messages.

27. Narvett either directed his clients to establish commodity futures trading accounts at the FCM referenced above, or he himself established accounts at that FCM on their behalf using their personal information and without disclosing his involvement to the FCM. He then traded futures contracts in their accounts until he exhausted the available funds. Narvett traded in at least seventeen accounts (for twelve clients) in this manner through the FCM referenced above. He executed these trades on a registered DCM and subject to the DCM's rules.

28. Overall, none of the seventeen trading accounts Narvett managed at the FCM were profitable. In total, during the Relevant Period, the accounts suffered collective losses of $253,772.03, inclusive of trading losses and commissions and fees charged by the FCM. He promised clients, including Clients A and B, that he would pay them back. However, contrary to his promises, he simply abandoned his former clients and moved on to the next client.

29. In addition, while a portion of these losses were incurred before Clients A and B transferred any funds to Narvett, Narvett never told Clients A and B that he lost money trading on behalf of other clients. With respect to Clients A and B, Narvett lost $14,294.06 trading in the account established on their behalf.

30. Records obtained from the FCM show that the seventeen client accounts referenced in Paragraphs 27 and 28 were accessed, and traded, from the following Internet Protocol ("IP") addresses, among others: XXXXXXX6.223, XXXXXXX28.67, XXXXXX0.205, and XXXXXXXX7.179. Upon information and belief, these IP addresses were registered to and/or exclusively utilized by Narvett.

8

31. Narvett was not registered with the Commission in any capacity during the Relevant Period.

## V. VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT I

**FRAUDULENT CONDUCT IN VIOLATION OF
SECTION 4*o*(1) OF THE ACT**

32. The allegations set forth in paragraphs 1 through 31 are re-alleged and incorporated herein by reference.

33. Section 4*o*(1) of the Act, 7 U.S.C. § 6*o*(1) (2018), makes it unlawful:

> for a commodity trading advisor . . . by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly–(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) to engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

34. As set forth above, during the Relevant Period, through the use of the mails or other means of interstate commerce, Narvett acted as a CTA. Narvett did so by soliciting members of the general public, communicating with them including via text messaging, trading their accounts via registered entities using the internet, and receiving compensation for his services, including checks.

35. From at least March 2017 through the present, Narvett used the mails or other means or instrumentalities of interstate commerce (including internet and telephone, among others) to employ devices, schemes, or artifices to defraud clients and participants as well as prospective clients and participants by, among other things, knowingly misappropriating client funds, making false statements and omissions regarding his trading successes and the safety of his trading strategy, promising trading profits, and omitting material information regarding the

9

prior regulatory action brought against him, his trading losses, the termination of his own account at the FCM where he traded client funds, the need for a power of attorney or similar authorization in order for him to make discretionary trades on behalf of clients, and the legal requirement that he register with the Commission as a CTA and his failure to do so. Further, he engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon his clients and participants as well as his prospective clients and participants.

36. Each act, representation, omission, or failure of Narvett, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4*o*(1) of the Act.

## COUNT II

### FRAUDULENT CONDUCT IN VIOLATION OF
### SECTION 4b(a)(1) OF THE ACT

37. The allegations set forth in paragraphs 1 through 36 are re-alleged and incorporated herein by reference.

38. Section 4b(a)(1) of the Act, 7 U.S.C. § 6b(a)(1) (2018), makes it unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person . . .
>
> (A) to cheat or defraud or attempt to cheat or defraud the other person;
>
> (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]
>
> (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract . . . .

10

39.     By the conduct alleged herein, Narvett cheated or defrauded, or attempted to cheat or defraud, people in connection with orders to make, or the making of, contracts of sale for future delivery made on or subject to the rules of a DCM, for or on behalf of those people.  He willfully deceived or attempted to deceive people, by, among other things, knowingly misappropriating client funds, making false statements and omissions regarding his trading successes and the safety of his trading strategy, promising trading profits, and omitting material information regarding the prior regulatory action brought against him, his trading losses, the termination of his own account at the FCM where he traded client funds, the need for a power of attorney or similar authorization in order for him to make discretionary trades on behalf of clients, and the legal requirement that he register with the Commission as a CTA and his failure to do so.

40.     Each act, representation, omission, or failure of Narvett, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(1) of the Act.

## COUNT III

**ACTING AS AN UNREGISTERED COMMODITY TRADING ADVISOR
IN VIOLATION OF SECTION 4m(1) OF THE ACT**

41.     The allegations set forth in paragraphs 1 through 40 are re-alleged and incorporated herein by reference.

42.     Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018), makes it unlawful:

> for any commodity trading advisor or commodity pool operator, unless registered under this Act, to make use of the mails or any means or instrumentality of interstate commerce in connection with his business as such commodity trading advisor or commodity pool operator . . . .

43. Section 1a(12)(A)(i) of the Act, 7 U.S.C. § 1a(12)(A)(i) (2018), defines a CTA, in relevant part, as any person who:

> for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic, media, as to the value of or the advisability of trading in–(I) any contract of sale of a commodity for future delivery, security futures product, or swap . . . .

44. As set forth above, during the Relevant Period, through the use of the mails or other means of interstate commerce, Narvett acted as a CTA without being registered under the Act. Narvett held himself out as a CTA by soliciting members of the general public, communicating with them, including via text messaging, trading their accounts via registered entities using the internet, and receiving compensation for his services including by check, all in violation of Section 4m(1) of the Act.

45. Narvett does not satisfy the exceptions to Section 4m(1) of the Act because he held himself out generally to the public as a CTA.

46. Each act, representation, omission, or failure of Narvett, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4m(1) of the Act.

## VI. RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and pursuant to its own equitable powers:

A. Find that Narvett violated Sections 4*o*(1), 4b(a)(1), and 4m(1) of the Act, 7 U.S.C. §§ 6*o*(1), 6b(a)(1), 6m(1) (2018);

B. Enter an order of permanent injunction enjoining Narvett, and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with

him, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of Sections 4*o*(1), 4b(a)(1), and 4m(1) of the Act, 7 U.S.C. §§ 6*o*(1), 6b(a)(1), 6m(1) (2018);

    C.    Enter an order of permanent injunction restraining and enjoining Narvett, and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him, from directly or indirectly:

    i.    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2018));

    ii.    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2020)), for accounts held by Narvett or in which Narvett has a direct or indirect interest;

    iii.    Having any commodity interests traded on Narvett's behalf;

    iv.    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

    v.    Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

    vi.    Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2020);

    vii.    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2020)), agent, or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2018)) registered, exempted from

registration, or required to be registered with the Commission, except as provided for in Regulation 4.14(a)(9)); and/or

      viii.    Engaging in any business activities related to commodity interests;

D.     Enter an order directing Narvett, as well as any third-party transferee and/or successors, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from the acts or practices which constitute violations of the Act and Regulations as described herein, including pre- and post-judgment interest;

E.     Enter an order directing Narvett, as well as any of his successors, to make full restitution to every person or entity who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

F.     Enter an order directing Narvett, as well as any of his successors, holding companies, and alter egos, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with, or among Narvett and any person or entity whose funds were received by Narvett as a result of the acts and practices that constitute violations of the Act and Regulations as described herein;

G.     Enter an order directing Narvett to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584, tit. VII, § 701, and Regulation 143.8, 17 C.F.R. § 143.8 (2020), for each violation of the Act or Regulations, as described herein, plus post-judgment interest;

H. Enter an order requiring Narvett to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412 (2018); and

I. Enter an order providing such other and further relief as the Court may deem necessary and appropriate under the circumstances.

Dated: March 5, 2021

Respectfully submitted,

**COMMODITY FUTURES TRADING COMMISSION**

s/ Julia C. Colarusso
Julia C. Colarusso, #1010466 (DC); #80241 (VA)
Luke B. Marsh, #475635 (DC)
Commodity Futures Trading Commission
Division of Enforcement
1155 21st Street, NW
Washington, DC 20581
Telephone: (202) 418-5000
jcolarusso@cftc.gov
lmarsh@cftc.gov

*Attorneys for Plaintiff*